# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs November 6, 2007

## STATE OF TENNESSEE v. ANTHONY JEROME NICHOLS

**Direct Appeal from the Circuit Court for McNairy County**
**No. 2004     Weber McCraw, Judge**

---

**No. W2006-02706-CCA-R3-CD  - Filed December 3, 2007**

---

The defendant, Anthony Jerome Nichols, was indicted for one count of attempted first degree murder, two counts of aggravated assault, and one count of reckless endangerment.  He was convicted of attempted second degree murder, aggravated assault and assault.  The trial court merged the aggravated assault and attempted second degree murder convictions and sentenced the defendant as a Range I, standard offender to twelve years, and to eleven months and twenty-nine days for the remaining assault conviction.  The sentences were set to run concurrently.  On appeal, the defendant argues that the evidence was insufficient to support his conviction for attempted second degree murder and that the trial court abused its discretion by enhancing his sentence.  Following our review of the parties' briefs, the record, and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

J.C. McLin, J., delivered the opinion of the court, in which Thomas T. Woodall and J. Curwood Witt, Jr., JJ., joined.

Shana Johnson, Assistant Public Defender, Somerville, Tennessee, for the appellant, Anthony Jerome Nichols.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Elizabeth T. Rice, District Attorney General; and Cameron Williams, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## BACKGROUND

Tara Nichols, the victim, testified that she was shot by the defendant, her ex-husband, on December 9, 2005.[1] Tara and the defendant were divorced on January 31, 2005, almost a year before the shooting. Tara had two daughters with the defendant, Lily and Kadie Nichols. Tara stated that at the time of the shooting, she was living in an upstairs apartment in a garage building adjacent to her father-in-law's home. Mr. Nichols, the defendant's father, offered the apartment to her while she searched for another home. She also stated that she had only been in the apartment about a week prior to the shooting.

Tara testified that on the day of the shooting she had asked a good friend, Shane Miller, for a ride home from work because her car had broken down. On the way to the apartment, the two picked up her youngest daughter, Kadie. Tara recalled getting out of Shane's car, picking up her daughter and her belongings, and walking up the steps to her apartment when she heard the defendant yelling at Shane to get off the property. She turned to see the defendant come around the side of the building and up the stairs with a shotgun held waist-high. The defendant came up the stairs about five or six steps and put the shotgun to his shoulder. Tara screamed at the defendant not to shoot her. She also testified that at the time she was shot, she was holding Kadie on her right hip.

Tara testified that the next thing she remembered was waking up in the hospital two days later. Tara noted that she was shot in the temple. She stated that as a result of the injury, she lost brain matter, her sinus cavities were gone, and she lost her sense of smell. Additionally, she suffered continuous headaches and "excruciating, sharp shooting pains" from the pellets of shotgun shell still lodged in her brain. She said that the shotgun shell pellets would remain there for the rest of her life. She further stated that the cerebral fluid around her brain was leaking and she was slated to undergo "extensive" surgeries to repair her brain.

Shane Miller testified that he had known Tara for five to ten years and that they were "good friends." On December 9, 2005, he gave Tara a ride home from work at her request because her car had broken down. At Tara's apartment, Shane pulled down the driveway to the parking area behind the garage by the stairs to the apartment. Tara got Kadie out of the car while he assisted with Tara's belongings and the car seat. While he was placing the car seat on the ground, he looked up and saw the defendant coming toward him from the adjacent house. Shane got in his truck and was preparing to leave when the defendant came up next to his window and pointed the shotgun at him. Shane stated that he reached and grabbed the shotgun to get it out of his face and told the defendant he would leave. The defendant jerked the shotgun out of his hand and walked away. According to Shane, the defendant headed toward the stairs where Tara was located. As soon as the defendant walked away, he dialed 911 on his cell phone. When Shane looked up again, he saw the defendant on the stairs to the apartment with the shotgun to his shoulder. Shane heard Tara scream not to shoot two or three times right before the defendant fired. Shane recounted that the defendant held the

---

[1]Because several of the people involved in this incident share the same surname, Tara Nichols, the victim, will be referred to as "Tara." No disrespect is intended to the deceased by use of her first name. Other witnesses will also be referred to by their first names. Tara was deceased at the time of trial, but her testimony from the preliminary hearing was read into the record for the court.

2

shotgun to his shoulder as he fired and did not trip and fall, accidentally causing the gun to discharge as he claimed.

Shane testified that after the defendant shot Tara, he backed his truck down the driveway to the far end of the building, and dialed 911. The defendant came back down the steps, pointed the gun at Shane again and began yelling. Shane could not make out what the defendant was saying because he was trying to talk to the 911 operator. Shane recalled that the defendant looked "pretty mad" and believed the defendant might shoot him. Shane stated that he pulled all the way out of the driveway and drove to a nearby store where he met one of the sheriff's deputies.

Ricky Roten, the McNairy County Sheriff, testified that he, along with Deputy Bob Pipkins, responded to the 911 call at the Nichols' residence. When he and Deputy Pipkins arrived at the foot of the stairs to the apartment, the defendant came walking down the stairs and said "I did it — I did it" or "I done it." Deputy Pipkins secured the defendant and placed him in the backseat of the patrol car. Sheriff Roten also testified that he found Tara lying in the hallway leading into the apartment, and Mr. Thomas Nichols, the defendant's father, next to her administering first aid. He observed that Tara was in serious condition, moaning and trying to talk, but unable to speak. Sheriff Roten also observed the gunshot wound to the right side of Tara's head.

Sheriff Roten testified that he recovered a shotgun laying on the bed inside the apartment. He took photographs of the shotgun which was identified as a Savage/Springfield Model 18 .410 gauge bolt-action shotgun with a magazine. Sheriff Roten found a live round inside the chamber, ready for firing, and three more rounds inside the magazine. The empty hull of a spent shotgun shell was recovered on the ground next to the apartment stairs. According to Sheriff Roten the shotgun had been in police custody since the shooting, except for a brief period of time when it was sent to the Tennessee Bureau of Investigation (TBI) laboratory in Nashville for analysis. The lab report revealed that the shotgun was operating properly, with a functioning safety.

Mildred Nichols, the defendant's stepmother, testified that she was in her kitchen when the defendant awoke from a nap, came into the kitchen and said, "they down there." The defendant went back to his room and Mildred looked out the window and saw Tara and Shane. The defendant returned minutes later with a shotgun in his hand. Mildred told the defendant "You don't need to go down there with that." The defendant said he only intended to "scare them." According to Mildred, her husband called right after the defendant walked out of the house and she told him the defendant was headed down toward the apartment with the shotgun. Mildred testified that she was still on the phone with her husband when she heard a shot. She hung up the phone and it immediately rang again. It was the defendant, calling her from the apartment. He told her to call 911, and said, "I slipped and tripped and the gun went off and I think I shot Tara." Mildred hung up again, called 911, then went down to the apartment, grabbed Kadie from the defendant and took her back to the house. Mildred recalled that about three minutes elapsed from the time the defendant left the house with the gun to the time she heard the gunshot.

3

The defendant testified that he and Tara were divorced and had two children. On December 9, 2005, he was living in the house with his father and stepmother, and that prior to that time, he had been living in the apartment above the shop where Tara resided. After taking a nap, he got up, went to the kitchen, looked out the window and saw Shane's white Chevrolet Tahoe in the driveway. The defendant testified that he went into his parents' bedroom and found the shotgun in the closet. He went outside, walked toward the apartment, and yelled at Shane three or four times to get off the property. Shane did not acknowledge him at first, but by the time the defendant reached the apartment, Shane had gotten in his truck and shut the door. The defendant walked around to the driver's side door and again told Shane to leave. However, the defendant stated that he did not point the shotgun at Shane, but instead, Shane reached out and grabbed the shotgun, causing the defendant to jerk it away from him. The defendant later admitted that he may have pointed the shotgun at the driver's side window. However, he insisted that he did not know whether the shotgun was loaded.

The defendant testified that after confronting Shane, he walked over to the apartment stairs and saw white Wal-Mart bags at the top of the stairs. He then went back to ask Shane if Tara was up there. Shane did not acknowledge him, but continued to look up at the apartment as though someone was there. The defendant heard a voice behind him and turned around to see Tara at the top of the stairs. He asked her why Shane was there and reminded her that his dad told her no one was allowed to be there other than Tara and the children. According to the defendant, Tara did not respond so he started walking up the steps when he tripped and fell. His fall caused the shotgun to go off. The defendant stated that at first he believed he had shot himself, and he began searching all over his body to see if he was bleeding. Finding no blood, he walked down the stairs and spotted Shane still in the driveway talking on his cell phone. The defendant admitted that he grabbed the shotgun again, pointed it at Shane and ordered him to leave the property, which Shane did.

The defendant testified that the next thing he heard was Tara saying, "Huggie, Huggie, help me. I can't see."[2] He looked up and saw Tara sitting up against the stair rails with blood all over her face. He moved to where she was sitting and asked what happened. She again responded that she could not see. According to the defendant he ran into the shop and grabbed some old T-shirts which he used to wrap Tara's head and stop the bleeding. Next, he moved her into the hallway of the apartment. After holding her head in his lap for a minute, he told her he would have to leave for a second and call 911 or his stepmother. He set his daughter Kadie on the couch, called his stepmother, asked her to call 911, and asked her to come pick up Kadie. When his stepmother arrived, he handed Kadie to her. Thereafter, his father arrived and asked what happened. The defendant told him that he guessed the shotgun went off, but he did not know where she was hit. His father began talking to Tara to keep her from panicking and administered first aid.

On cross-examination, the defendant testified that he only intended to scare Shane with the shotgun because he did not think it was loaded. He admitted that he did not check the safety mechanism on the shotgun because his father did not usually keep loaded weapons in the house. The defendant claimed that he had his finger "around" the trigger when he fell and may have discharged

---

[2] "Huggie" was Tara's nickname for the defendant.

4

the shotgun as a result. The defendant stated, "I can only assume that I pulled the trigger because it was the bullet from my gun that hit her." The defendant could not recall seeing his daughter, and he assumed she was inside the apartment when the shotgun went off. The defendant admitted that if he aimed a loaded gun at Tara while she was holding Kadie on her right hip, there would be a substantial risk of death or injury to his daughter. However, he disputed this assertion because no blood was found on Kadie after the shot.

Thomas Nichols, the defendant's father, testified that he was on his way home from picking up his granddaughter, Lily, from school when his wife called and said the defendant had gone over to the apartment with a shotgun. He sped directly to the apartment and went to the stairs where he was met by the defendant. The defendant told him that he thought he shot Tara. Thomas asked, "What do you mean you think you shot Tara?" The defendant responded, "I stumbled and the gun went off and I think I shot Tara." Thomas pushed past the defendant and went to Tara who was on the floor in the hallway of the apartment.

Thomas testified that he called 911 on his cell phone while he attempted to calm Tara down and administer first aid. He did not see the shotgun when he first got there. After kneeling next to Tara, he looked up and saw the defendant holding the gun up under his chin. The defendant said, "Daddy, if Tara dies, I'm going to blow my brains out." In response, Thomas jumped up, grabbed the shotgun from the defendant, and threw it in on the bed in the bedroom off the hall. The defendant went outside while Thomas stayed with Tara trying to calm her, until the paramedics arrived.

Thomas recounted that Tara was told that no visitors were allowed on the property without first meeting him at the house. Thomas recalled that he loaded the shotgun and left it for his wife to use for her protection while he was away working at night. He also recalled that he told her to be very careful with it because it was not "operating properly." He stated that he was sure that the safety mechanism on the shotgun was operable and "on," meaning that the shotgun would not fire until the safety was disengaged. Thomas further recalled that on a past hunting trip he stumbled and tried to break his fall with the shotgun, causing it to discharge accidently. Since that time, he had not allowed anyone to use the gun. According to Thomas the shotgun had an infrequent shell loading problem, forcing the gun's operator to push the shell back into the chamber to get it to eject properly before loading the next round.

On rebuttal, the state recalled Sheriff Roten who testified that he was certified in firearm instruction and was familiar with guns from hunting and frequent use. He stated that the shotgun in question did not have a "hair-trigger" which would discharge if lightly touched. Instead, the shotgun trigger required several pounds of pressure to shoot. Sheriff Roten also stated that he had tested the shotgun by removing the safety device while the weapon was unloaded. He threw the shotgun on the floor several times and hit the butt of the shotgun on the floor, but was unable to trip the trigger. He stated that he believed his own analysis was consistent with the results of the TBI tests that found that the shotgun functioned properly.

## ANALYSIS

### I. Sufficiency

As his first issue on appeal, the defendant argues that the state failed to present sufficient evidence at trial to establish the elements of attempted second degree murder.

Upon review, we reiterate the well-established rule that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to the court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); *see* Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002).

Second degree murder is "[a] knowing killing of another." *See* Tenn. Code Ann. § 39-13-210(a)(1). A knowing act requires one to be "aware of the nature of the conduct" and "aware that the conduct is reasonably certain to cause the result." *Id.* §§ 39-11-302(b). A result-of-conduct crime does not require as an element that an actor engaged in a specified course of conduct accomplish the specified result. *State v. Ducker*, 27 S.W.3d 889, 896 (Tenn. 2000). Criminal attempt is statutorily defined as follows:

> (a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:
>
> (1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;
>
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
>
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person

believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101. Whether the defendant "knowingly" attempted to kill the victim is a question of fact for the jury. *See State v. Inlow*, 52 S.W.3d 101, 105 (Tenn. Crim. App. 2000). Intent may be inferred by the trier of fact from the character of the offense and from all the facts and circumstances surrounding the offense. *See Inlow*, 52 S.W.3d at 105 (quoting *State v. Holland*, 860 S.W.2d 53, 59 (Tenn. Crim. App.1993)).

When viewed in a light most favorable to the state, the evidence supports the defendant's conviction for attempted second degree murder. At trial, Shane testified that the defendant threatened him with the shotgun, then shouldered the shotgun and shot Tara. Tara, the victim, testified that the defendant shot her in the head despite her pleas not to shoot. The Sheriff, who personally tested the shotgun, as well the lab analysis of the TBI, both showed the gun to be a properly functioning weapon requiring substantial pressure to shoot. It is apparent that the jury weighed the evidence, considered the facts and circumstances of the case and declined to credit the defendant's testimony that he tripped and fell causing the gun to discharge accidentally. *See Bland,* 958 S.W.2d at 659. Therefore, the defendant is not entitled to relief on this issue.

## II. Sentencing

The defendant also argues that the trial court improperly enhanced his sentence for attempted second degree murder.

Before a trial court sentences a convicted defendant, it must consider (1) the evidence received at the trial and/or sentencing hearing; (2) the presentence report; (3) the principles of sentencing; (4) the arguments of counsel relative to sentencing alternatives; (5) the nature and characteristics of the criminal conduct involved; (6) any mitigating or enhancement factors; (7) any statements made by the defendant in his or her own behalf; and (8) the defendant's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -114, -210; *State v. Imfeld*, 70 S.W.3d 698, 704 (Tenn. 2002). The trial court is also required to place on the record its reasons for imposing the specific sentence, including identification of any mitigating and enhancement factors found, the specific facts supporting each enhancement factor found, and the method by which the mitigating and enhancement factors have been evaluated in determining the sentence. *Id.*

Appellate review of a challenged sentence is a de novo review of the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401 (2006). This presumption of correctness is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. *State v. Pettus*, 986 S.W.2d 540, 543-44 (Tenn. 1999). However, if the record shows that the trial court failed to consider the sentencing principles and all relevant facts and circumstances, then review of the challenged sentence is purely de novo without the presumption of correctness. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). On appeal, the defendant has the burden of showing that the

sentence imposed by the trial court is improper. Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments.

The offenses committed by the defendant in this case occurred on December 9, 2005, after the imposition of the 2005 amendments to the Tennessee Criminal Resentencing Reform Act of 1989. The 2005 amendments apply to criminal acts committed on or after June 7, 2005, and govern the offenses in this case. *See* Tenn. Code Ann. § 40-35-114 (2006), Compiler's Notes. Under the 2005 amendments, the trial court "shall consider, but is not bound by," the "advisory" enhancement factors set out in Tennessee Code Annotated section 40-35-114. The trial court may, within its discretion, enhance or mitigate within the range of punishment, if it makes a finding on the record of what mitigating or enhancement factors were considered. *See* Tenn. Code Ann. § 40-35-210(e).

In the instant case, the defendant was convicted of attempted second degree murder, a Class B felony. The sentencing range for a Range I offender convicted of a Class B felony is between eight and twelve years. *See id.* § 40-35-112(2).[3] The trial court found four enhancement factors and no mitigating factors. Specifically, the trial court determined that the offense involved more than one victim, defendant had a prior history of criminal convictions or criminal behavior, injuries the victim sustained were particularly great, and the defendant had no hesitation about committing the crime when the risk to human life was high. *See id.* § 40-35-114 (3), (1), (6), (10).

The state concedes in its brief that the trial court may have misapplied enhancement factor (3), namely that "the offense involved more than one victim." Tenn. Code Ann. § 40-35-114(3). Victim, "as used in Tenn. Code Ann. § 40-35-114(3), is limited in scope to a person or entity that is injured, killed, had property stolen, or had property destroyed by the perpetrator of the crime." *State v. Kelly,* 34 S.W.3d 471 (Tenn. Crim. App. 2000) (quoting *State v. Raines*, 882 S.W.2d 376, 384 (Tenn. Crim. App.1994)). The psychological injuries suffered by relatives witnessing an attack on the actual victim are not covered by the meaning of the word "victim." *See State v. Charles N. Howell*, No. 03CO1-9406-CR-00203, 1996 WL 55651 (Tenn. Crim. App., Knoxville, Feb. 12, 1995) (enhancement factor for more than one victim not applicable where daughter witnessed stepfather shooting and killing mother). Based on the authority cited above, we agree with the state that the trial court misapplied enhancement factor (3) in the instant case. *Id.* However, because the trial court is able to consider Kadie, the defendant's daughter, under enhancement factor (10), that the defendant had no hesitation about committing a crime when the risk to human life was high, in addition to the other enhancement factors enumerated below, any resulting error based on misapplication of enhancement factor (3) is harmless. *See* Tenn. Code Ann. §40-25-114(10).

The trial court determined that the defendant qualified for enhancement factor (1), "a prior history of criminal convictions or criminal behavior" based on his criminal record which contained two misdemeanor convictions, one for simple assault and another for a traffic violation. The court

---

[3] The defendant in his brief mistakenly asserts that the minimum presumptive term for the defendant's conviction of attempted second degree murder is 6 years. Because the record reflects that the defendant was a Range I offender convicted of a Class B felony, the correct range for sentencing is between 8 and 12 years.

also noted that the defendant had a lengthy arrest record on matters that had no disposition, including aggravated assault, unlawful possession of a weapon, and a domestic assault charge continued for six months and then dismissed based on the defendant's participation in an anger management program. In addition, the court heard testimony from Tara's mother at the sentencing hearing. She testified about the defendant's behavior, including incidents where the defendant struck Tara, and where Tara sought refuge with family members as a result of altercations with the defendant.

The testimony of Tara's mother, Lynn Mitchell, also demonstrated that the injuries the victim sustained were "particularly great." Tenn. Code Ann. § 40-35-114(6). Ms. Mitchell testified to the following regarding Tara's injuries:

> She - Her right eye and the right side of her forehead and side of her head were basically destroyed. The surgeons were able to piece together enough that she still had a gaping wound about this big (indicating) here. She lost her right eye. She lost all sense of smell. She lost her frontal sinus cavities. She lost part of her brain that affected her personality and her moods. She did lose some things, some memory of how to do some things. She also lost some of her sense of taste, and she lived in constant fear because of what she had been through. It also affected her self-confidence, her self-esteem.
>
> . . . .
>
> . . . [Her quality of life] was controlled a lot by depression, by fear. She was under counseling. It was controlled by excruciating pain, by doctor's visits, surgeries, recuperation time, very limited initially for almost a month she was blind in both eyes and when you take a person that was sighted and at 23 suddenly becomes blind in both eyes, that's very traumatic, first of all to even function, plus the pain from the wounds and it just incorporates a lot of fear because you can't even see what is going on, who's coming at you or anything.

Ms. Mitchell also testified that Tara lost her job and was unable to work after the shooting. The defendant, in his brief, argues that the court placed too much emphasis on Ms. Mitchell's testimony. However, the defendant does not offer any specific citation to the record, beyond Ms. Mitchell's entire testimony at sentencing, or to any legal authority to support his position.

Finally, as mentioned above, the evidence supports the trial court's conclusion that the defendant had no hesitation about committing the crime when the risk to human life was high. Tenn. Code Ann. § 40-35-114(10). The jury was presented with evidence at trial that Tara was holding Kadie, the defendant's daughter at the time the defendant shot her. Kadie could have easily been injured, along with the victim. As the state points out, this enhancement factor is not inherent in the offense of attempted murder where persons other than the victim were present and could have been injured. *See State v. Makoka*, 885 S.W.2d 366, 373 (Tenn. Crim. App. 1994), *perm. app. denied* (Tenn. Sept. 12, 1994) (factor (10) applies when other possible victims are present, the defendant

9

was convicted of attempted murder). *See also State v. Sims*, 909 S.W.2d 46, 50 (Tenn. Crim. App.1995) (enhancement factor (10) may be applied in circumstances where individuals other than the victim are in the area of the defendant's criminal conduct and are subject to injury.)

Based on the trial court's consideration of enhancement factors (1), (6), and (10), discussed above, ample evidence exists to support the defendant's sentence, even without consideration of enhancement factor (3). The defendant has not shown any abuse of discretion or error by the trial court. Accordingly, we conclude that the trial court did not err by imposing a sentence of twelve years for attempted second degree murder. The defendant is not entitled to relief on this issue.

## CONCLUSION

Based on the foregoing, we affirm the judgments of the trial court.

_____
J.C. McLIN, JUDGE

10